## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

# JS-6

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-02831-SVW-E | | Date | August 14, 2023 |
|---|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | | |

Present: The Honorable   STEPHEN V. WILSON, U.S. DISTRICT JUDGE

| Paul M. Cruz | N/A |
|---|---|
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| N/A | N/A |

**Proceedings:**   ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS THE FIRST AMENDED COMPLAINT [35] [42]

### I.   INTRODUCTION

Before the Court are motions to dismiss brought by Defendants Jeff Bezos, Jennifer Salke, Patrick McKay, John Payne, Amazon Studios LLC, Amazon Content Services LLC, Simon Tolkien, the Tolkien Estate Limited, and the Tolkien Trust (collectively "Defendants"). There are generally two groups of defendants: those associated with Amazon and those associated with the author J.R.R. Tolkien. The Amazon-affiliated defendants and the Tolkien-affiliated defendants have each made motions to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

The two groups of defendants ask the Court to resolve the following question: When the author of an unauthorized "sequel" to a copyrighted book sues for copyright infringement the author of the original work and those who have created lawful derivative works, has the author plausibly stated a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure? The answer here is no.

Thus, for the following reasons, the motions to dismiss are GRANTED.

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

## II.     BACKGROUND[1]

Plaintiff Demetrious Polychron ("Plaintiff" or "Polychron") is an author whose works "explor[e] themes such as the nature of heroism and humanity, the relationships between Gods, Devils and mankind, the limits of technology, and the power of myth and legend." *Fractal Books*, "Our Mission," https://www.fractalbooks.com/our-mision/ (last visited August 3, 2023).

To that end, Plaintiff appears to have published at least three books: *Deus Ex Machina: God From the Machine*; *The Four Horsemen of the Apocalypse*; and, as is relevant here, a book called *The Fellowship of the King*, which is based on *The Lord of the Rings* by J.R.R. Tolkien. *See id.*, *The Fellowship of the King*, https://www.fractalbooks.com/product/the-fellowship-of-the-king/ (featuring a review stating that the book was, according to one "Michael Boh, Fund Manager" of Beverly Hills, California, "as entertaining to read as Tolkien!"). This book is offered for sale for between $17.99 and $26.99. *Id.* Plaintiff's website appears to show a second book based on *The Lord of the Rings*, called *The Two Trees*; Plaintiff also asserts that he has written seven books total in this series. *Id.*; First Amended Complaint, ECF No. 31 ("FAC"), at ¶ 20.

*The Fellowship of the Ring* appears to be a fantasy novel following "Elanor, daughter of Samwise" who is a "debutante" but must "[j]oin in the Quest for . . . the last of Sauron's corrupted Rings of Power." *The Fellowship of the Ring*, https://www.fractalbooks.com/product/the-fellowship-of-the-king/ (last visited August 3, 2023).

Polychron registered *The Fellowship of the King* with the United States Copyright Office on November 21, 2017. FAC ¶ 22. Also on November 21, 2017, Plaintiff sent a letter to Defendant Simon Tolkien, who is the grandson of J.R.R. Tolkien. *Id.* ¶ 26. The letter states:

Dear Mr. Tolkien,

---

[1] The Defendants' request for judicial notice, at ECF No. 29, is granted. In considering a motion to dismiss under Rule 12(b)(6), the Court may consider materials appended to the complaint and documents "whose contents are alleged in the complaint and whose authenticity no party questions." *Branch v. Tunnell*, 14 F.3d 449, 454 (9th Cir. 1994). The Court may therefore take judicial notice of the works at issue—Plaintiff's novels and Defendants' television series, as well as *The Lord of the Rings* itself—and the correspondence referenced in Plaintiff's first amended complaint. The Court likewise takes judicial notice of Plaintiff's website, which is "in the public realm." *Von Saher v. Norton Simon Museum of Art at Pasadena*, 592 F.3d 954, 960 (9th Cir. 2009).

|  | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

Happy birthday to your father!

I hope he's had a great day. Congratulations to him on his retirement. His stewardship of his father's work, his texts and notes, have been monumental, literally. He deserves to rest and relax.

I know you have a birthday coming soon, as do many people in your family. Coincidentally, I have the same birthday as your cousin Michael – January 11. Though I'm closer to you in age and living in Los Angeles, which makes me closer to you than England.

That's probably why you've been first in my mind to share this news and I've always imagined you'd be the first person to read what I've written. I remember you talking about how fascinated you were when Gandalf finally found Isildur's scroll in Minas Tirith.

I read an interview you gave in which you said the reason you wrote books about lawyers was because you are one. You'd been inside a courtroom so you could write a novel about lawyers.

But you'd never been to Middle-earth. Sorry to those who pestered you about writing a sequel to your grandfather's books.

When I was eleven, a childless young couple moved into my neighborhood. I passed the husband in his new front yard gardening and we struck up a conversation. He was surprised I'd read so many mythologies and when I became brash, he challenged my knowledge on trolls.

Thanks to Marvel Comics, I knew the answers. But it surprised him I'd never heard of JRR Tolkien. He gave me a copy of 'The Hobbit' to see if I might like it. I was enchanted.

I became friends with his wife, who was also a huge fan and for Christmas, they made a gift of a deluxe boxed edition of 'The Lord of the Rings.'

For three days, I stayed in my room except for meals and devoured the worlds of JRR Tolkien. Over the years, I re-read those book until the spines gave out. After that, I'd lie in bed for hours every night imagining I was in Middle-earth on the Road with the hobbits.

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|----------|---------------------|------|-----------------|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

I recognized what many had: after the Three passed West there were still at least fifteen Rings of Power unaccounted for in Middle-earth. Three books had been written about One.

For years, I imagined what those other Rings might do and the affect whoever found them might have on the lives of the people who survived the War of the Ring.

After Peter Jackson's adaptations of your grandfather's books, a lot of Tolkien-related websites published details of your grandfather's unpublished papers. They could have come from librarians at Marquette University and some probably did, but it seemed some came from members of the Tolkien family.

Thank God for those notes. Without them, I wouldn't have written this book. Your grandfather wrote on a margin: "[Dark Elf] was also sometimes applied to Elves captured by Morgoth and enslaved and then released to do mischief among the Elves. I think this latter idea should be taken up."

Some part of my creative subconscious took that as a command from your grandfather. It was my moment of inspiration. I immediately sat down and wrote what has become the single largest narrative section, and one of the best and my favorite chapters.

A popular saying is, "Don't reinvent the wheel." Meaning, don't start from scratch making every mistake possible. Some people interpret it as 'don't do what has already been done.' Both are equally valid.

But a common misconception is inventing the wheel was easy, and if whoever did it hadn't, someone else certainly would have.

The truth is – no one reinvented the wheel. Every wheel came from someone who saw the first one or one of its descendants. That's why the people in the Americas had no wheels. They'd passed over the Bering-Strait before the first one was invented.

Another thing I've read which I really like, 'The true measure of an idea's brilliance is how obvious it seems once someone finally thinks of it.'

Coming up with the obvious: the wheel, the airplane, the first rocket to the moon is the hardest

| | : |
|--|--|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|----------|---------------------|------|-----------------|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

thing in the world to do.

I once read a best-selling author who gets a 20 million advance to sit down and start a new book. He wrote even with the motivation and acclaim, writing books is the hardest thing in the world.

For the last three years, I've been doing the most obvious hardest thing in the world: I've been writing the obvious pitch-perfect sequel to 'The Lord of the Rings.'

I know I shouldn't have, but I really didn't have a choice. Once the inspiration came, the hardest part was over and it was the one book I most dearly wished I could buy which I couldn't find on the shelf in a book store. I wrote it for all the right reasons you're supposed to write books. My number one intention was to write the best story possible. Number two was to stick as close to canon as I could. Third was to take those criticisms of his work; there weren't many strong empowered women or minorities, or those things unaccounted for or seen as errors, and show we were blind men with the elephant, we just hadn't been given a view of the 'big picture.'

I started performing poetry on stage when I was five, in Greek. I'm a quarter German and I speak it. I started winning awards for my writing at thirteen. I started writing poetry because I'd read your grandfather's books and I started winning awards for my poetry when I was sixteen. My poetry was published by a scholastic journal at eighteen. I was invited to write for magazines when an editor saw my posts on a listserve and I was internationally published.

But I didn't enjoy writing articles. I finished my first screenplay when I was thirty-three and two of my unproduced scripts have been recognized by the Academy of Motion Picture Arts and Sciences for excellence. Adapting one of those became my first unpublished novel. I've outlined over 150 novel ideas (pun intended). But after all these years, I'd decided to quit.

The one book I couldn't quit without writing was this one.

I've repeatedly been told I'm a gifted writer. As you probably understand being a writer yourself, most of being any good is rewriting and working very, very hard. I've rewritten this first book on Middle-earth over twenty times. It better be good.

I haven't listed these things to pat myself on the back. I wanted to assure you this story is engaging, entertaining, and meant as a loving homage to your grandfather and his work.

|  | : |
|--|--|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

I don't believe anyone else could do or come close to doing what I've done with the magnificent set pieces he created that no one ever used. I believe it's what he would have wanted.

I'd love to share what I've done with you, answer your questions and invite you to see how much amazing adventure, fun and heartfelt emotion is in ever chapter and almost on every page.

I know some people will hate anything about Middle-earth not written by your grandfather. Admittedly, at 180k words, the finished manuscript isn't perfect. But most of it is very good. For anyone who loves Middle-earth, there's an awful lot to love.

Sincerely,

Demetrious Polychron

PS: FYI – like your grandfather, I grew up in a religious household, Greek Orthodox. I went to Naval Nuclear Power school, ran one of the nuclear reactors aboard the USS Enterprise (CVN-65), am a decorated combat veteran, and was Honorably Discharged. I renewed my current and active SECRET Security Clearance with the Department of Defense and the Department of Energy, and I have worked at Boeing El Segundo and the Raytheon satellite production facilities.

ECF No. 37-2, Ex. B.

Tolkien did not respond to Plaintiff's letter. FAC ¶ 26.

Two years later, in November 2019, Plaintiff retained a law firm—who is not representing Plaintiff in the instant lawsuit—to contact the Tolkien Estate, this time to ask for a license. This correspondence stated:

Dear Mr. Meier:

I am writing on behalf of our client Demetrious Polychron, to request a license from The Tolkien Estate Limited. Mr. Polychron would like to use the intellectual property created by J.R.R. Tolkien to create and publish a seven-book sequel to *The Hobbit* and *The Lord of the*

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|----------|---------------------|------|-----------------|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

*Rings*. Mr. Polychron has already written the first book in this seven-book series and he is in the process of writing the second.

Mr. Polychron is a life-long fan of the original J.R.R. Tolkien books and he is also one of the many enthusiastic fans that have wished for more original stories set in Middle-earth. We felt that it would be most helpful to your understanding of Mr. Polychron's enthusiasm for the J.R.R. Tolkien books to include his personal statement along with this letter . . . .

Mr. Polychron would be very pleased to send you the first book for review on a confidential basis. If after reading the book, the Estate is willing to grant a license to Mr. Polychron, we would propose entering into a copyright and trademark license agreement in which the Estate and Mr. Polychron would share in the ownership and profits generated by all seven books.

ECF No. 37-3, Ex. C. The attached statement of interest asserted that *The Fellowship of the King* was intended to be a continuation of *The Lord of the Rings*. *Id.*

The Tolkien Trust denied Plaintiff's licensing request because it has a policy that it categorically does not provide intellectual property licenses to so-called sequels of *The Lord of the Rings* given that such sequels were contrary to the wishes of J.R.R. Tolkien. ECF No. 37-4, Ex. D.

Undeterred, in December 2019, Plaintiff decided to journey to Tolkien's personal residence in Santa Barbara to hand-deliver a copy of Plaintiff's work. FAC ¶ 28. Plaintiff included another letter to Tolkien. The letter did not explain how Plaintiff discovered Tolkien's personal address, but it did further elaborate on his inspiration for *The Fellowship of the King*:

Dear Mr. Tolkien;

Merry Christmas

You hold in your hands a gift. It was originally a gift from you grandfather to the world: the gift of Middle-earth. Now it has come full circle. This is my gift to you.

Of particular interest will be two undiscovered poems by JRR Tolkien. The first can be found o page 218. I imagine when reading it, it will be obvious where it came from. It is 100% the words of your grandfather; "The Lay Of Númenor."

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

The second consists of roughly equal contributions between JRR Tolkien and myself. It is at the end of the book on page 370-372, "The Lay Of The Two Trees."

When I first started writing, I had no plan nor any real knowledge of what I was getting myself into. I only knew that I loved this world and it seemed to me the Holy Grail of fantasy adventure; the thing that everyone wanted someone to do: to write the sequel to The Lord Of The Rings.

So that's what I did. I have spent many, many years living in this world and breathing life into these characters. Sharing their journeys. As an author, you know what that is like.
But now that it's written, I'm not sure what to do with it. My goals are to protect and promote the Estate. If I, and all of my beta-readers, did not unanimously agree that these stories distinguish themselves as a credit to the literary legacy of JRR Tolkien, I wouldn't be offering them to you.

As a fellow writer, I imagine you might understand my predicament. There are doubtless very few people alive outside of the Estate and your collaborators who have spent so much time in this world and who know it as well as I do. These characters are like real people to me. Almost like my children. And like children, I want them to live; to see them make their way out into the world, succeed, be happy, and fulfill their purpose. I cannot conceive of deleting this manuscript.

I have zero interest in infringing on your rights; the rights of the Estate. I do not want any money from you. Quite the opposite, I am trying to put a ridiculous amount of money in your pockets. I am also offering the opportunity for a 'do over:' a once in a lifetime opportunity for the Estate to be on the ground floor of a whole new generation of characters and stories, coming to life across a whole new slew of entertainment platforms, and reaching an even wider global audience.

Does giving up ownership in these stories and characters I have labored over for years seem improbable? Of course. But I wrote them for your grandfather, to honor his legacy, and for the fans, like myself, who have spent years yearning; waiting our whole lives for these stories.

I know it is conceivable to change all the names and publish these books by myself as something else. To me, that feels like taking your child and putting them into a Witness

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

Protection program, alone. It almost feels like a death. I do not have it in me to do that. Not to these characters I love.

[ . . . ]

Sincerely,

Demetrious

ECF No. 37-5, Ex. E.

Plaintiff alleges that the Amazon Defendants created a television show called *Rings of Power* that was initially "set to take place years following the LOTR series, focusing on a Young Aragorn, the future King of Gondor, but subsequently, and after Tolkien viewed Polychron's manuscript, it changed its focus to the three Elven rings and to 6000 years earlier, consistent with Polychron's story." FAC ¶ 29. In 2022, Amazon released *Rings of Power* on its streaming platform.

Plaintiff filed the instant lawsuit for (1) copyright infringement; (2) contributory copyright infringement as against the Amazon Defendants only; (3) vicarious copyright infringement as against the Amazon Defendants only; and (4) unfair competition as against the Tolkien Defendants only. *See generally* ECF No. 31. Defendants filed their motions to dismiss on July 17, 2023. Plaintiff opposed the motion on August 7, 2023. Deeming the matter suitable for resolution without oral argument pursuant to Local Rule 7-15, the Court took the motions under submission.

### III.   LEGAL STANDARD: RULE 12(b)(6) -- MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of the claims stated in the complaint. *See* Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A complaint that offers mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Id.*; *see also Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

(9th Cir. 2009) (citing *Iqbal*, 556 U.S. at 678).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). Thus, "[w]hile legal conclusions can provide the complaint's framework, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679.

## IV.    DISCUSSION

### A. Derivative Works

Defendants' primary argument is that Plaintiff's work, regardless of whether it is registered, is an unauthorized derivative work that thus precludes him from bringing a copyright infringement claim against Defendants. The Court agrees.

The Copyright Act defines a derivative work as "a work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. §101. Copyright owners have the exclusive right to prepare or authorize derivative works under the Act. The Ninth Circuit has stated that a derivative work is one which "would be considered an infringing work if the material which it has derived from a preexisting work had been taken without the consent of the copyright proprietor of such preexisting work." *Mirage Editions, Inc. v. Albuquerque A.R.T. Co.*, 856 F.2d 1341 (9th Cir.1988) (quoting 1 Nimmer on Copyright § 3.01 (1986)).

Accordingly, in determining whether a work is derivative, courts apply the traditional copyright infringement test used to determine whether copying has occurred. Where no direct evidence of copying is provided, a plaintiff may establish copying by showing "that the infringer had access to the work and that the two works are substantially similar." *Shaheed-Edwards v. Syco Entm't, Inc.*, No. 17-cv-6579 (SJO).

Substantial similarity is assessed through the extrinsic test and the intrinsic test. "The extrinsic test requires plaintiffs to show overlap of concrete elements based on objective criteria, while the

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|----------|---------------------|------|-----------------|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

intrinsic test is subjective and asks whether the ordinary, reasonable person would find 'the total concept and feel of the works' to be substantially similar." *Unicolors, Inc. v. Urban Outfitters, Inc.*, 853 F.3d 980, 985 (9th Cir. 2017). Courts do not consider the intrinsic test in evaluating a motion to dismiss because it is a question solely for the jury.

The Court agrees with Defendants that *Anderson v. Stallone* is instructive. There, the plaintiff created a treatment called "Rocky IV" that he "hoped would be used by Stallone and MGMUA Communications Co. as a sequel to Rocky III." *Anderson v. Stallone*, No. 87-0592 WDKGX, 1989 WL 206431, at *1 (C.D. Cal. Apr. 25, 1989). The plaintiff provided the treatment to the defendants and discussed the possibility of using the treatment in developing the next Rocky film. *Id.* Plaintiff alleged that the movie that ultimately became *Rocky IV* infringed his treatment. *Id.* Plaintiff's treatment used the exact characters that appeared in the prior Rocky movies, and the plot of the proposed treatment was a sequel to the prior movies. Because of the uncontroverted use of characters, themes, and ideas created previously for the *Rocky* films, the court concluded that it did not need to proceed to determining whether the works were substantially similar.

The same is true here. "Usually a court would be required to undertake the extensive comparisons under the . . . substantial similarity test to determine whether [Plaintiff's] work is a derivative work. *See* 1 M. Nimmer, § 3.01 at 3–3; pgs. 25–28 *supra*. However, in this case, [Plaintiff] has bodily appropriated the [*Lord of the Rings*] characters in his [novel]. This Court need not determine whether the characters in [Plaintiff's work] are substantially similar to [Defendants'] characters, as it is uncontroverted that the characters were lifted lock, stock, and barrel from [*The Lord of the Rings*]. *Id.* at *8.

Here, Plaintiff has admitted that the characters were taken directly from *the Lord of the Rings* in his correspondence with Simon Tolkien and the Tolkien Estate. He has also admitted that his series is intended to be a sequel to *The Lord of the Rings*, so every plot point flows from the ending of the *Lord of the Rings* series—thereby continuing the story of what would happen to the rings, the original characters, and their children. *See, e.g.*, ECF No. 37-3 ("Mr. Polychron would like to use the intellectual property created by J.R.R. Tolkien to create and publish a seven-book sequel to *The Hobbit* and *The Lord of the Rings*. Mr. Polychron has already written the first book in this seven-book series and he is in the process of writing the second.").

Plaintiff contends in his opposition that *Anderson* is inapposite because the Anderson plaintiff's treatment did not "create new characters or modify the characters at all" and because "the Rocky movies

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

are based upon the relationship of the characters over time and are not full of complexity." ECF No. 44 at 6. Even setting aside Plaintiff's implication that *The Lord of the Rings* is not about the relationships between characters and that the Rocky movies are simple, Plaintiff is mistaken that adding new characters and settings means his work is not an unauthorized derivative.

For instance, in *Salinger v. Colting*, the defendant wrote a "sequel" to *The Catcher in the Rye*. *Salinger v. Colting*, 641 F. Supp. 2d 250, 254 (S.D.N.Y. 2009), *vacated on other grounds*, 607 F.3d 68 (2d Cir. 2010). As here, where Plaintiff's book involves some of the same characters as in *The Lord of the Rings*, for example, Sam and his family, in Salinger, the defendant's work also involved the same protagonist, his family, and some characters from the plaintiff's novel. 607 F.3d at 72. Likewise, here, where Plaintiff intended his series to be a sequel to *The Lord of the Rings*, by envisioning what would happen after the original series, the *Salinger* defendant's book was also intended to envision what would happen to the *Catcher in the Rye* protagonist in old age. *Id.* And, as here, in *Salinger*, the infringing book's plot was "parallel" to the original, namely, in that the protagonists of each work "leave an institution, wander around New York City for several days, reconnect with old friends . . . and ultimately return to a different institution." *Id.* Plaintiff's book also parallels *The Lord of the Rings* in that it appears to the Court to be a coming-of-age story where a hobbit leaves a comfortable home in the Shire to contend with various magical rings, fight evil, and fraternize with myriad other species. And, as here, the *Salinger* defendant explicitly made his novel out as a sequel to *The Catcher in the Rye*. *Id.* The *Salinger* court granted a preliminary injunction against the defendant even where the defendant included new characters and plot points in his work, such as the addition of J.D. Salinger himself as a character. *Id.* The Court therefore rejects Plaintiff's contention that the fact that his work contains different plot and character elements as the original means it is not an unlawful derivative work.

Accordingly, Plaintiff's work is an unauthorized derivative work that is not entitled to copyright protection. Though Defendants appear to be correct that there is some question in the case law as to whether the derivative work's original elements may be protected, where, as here, Plaintiff's work is intended to be a literal continuation of a copyrighted work, but was not authorized to use the Tolkien intellectual property, and Plaintiff has sued the original creators, section 106(2) of the Copyright Act forecloses such a claim. *Anderson*, 1989 WL 206431 at *11.

Plaintiff's first three causes of action, for various types of copyright infringement, therefore fail as a matter of law.

**B. Copyright Infringement**

| | | : | |
|---|---|---|---|
| | Initials of Preparer | | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

Even if Plaintiff's work was not an unauthorized derivative, and even construing all inferences in his favor and accepting as true that Defendants had access to his work, Plaintiff does not plausibly plead that his novels and the Amazon series *Rings of Power* are substantially similar under the extrinsic test.

Before proceeding to a comparison of the extrinsic elements of the works, the Court must filter out unprotected expression in the Plaintiff's work. In other words, the Court must filter out elements that Plaintiff directly copied from *The Lord of the Rings* or that are generic scenes a faire.

As a threshold matter, the Court declines to consider any alleged similarities between Plaintiff's book and Defendant's television series that were not in the registered version of Plaintiff's work: namely, the cover design, the coat of arms, a woman obtaining an apprenticeship, or a "Lote tree."

Next, the Court filters out any unprotectable elements. Plaintiff's references to characters created by J.R.R. Tolkien such as Elanor, Marigold, Durin, Galadriel, Elrond, and Celebrimbor are therefore unprotectable elements. The other general similarities, such as the types of species who inhabit Middle Earth, magical rings, and the fight against evil beings are also either attributable to Tolkien or flow from the world he created. *Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002).

After filtering out these unprotectable elements, Plaintiff does not plausibly plead any similarities between his work and *Rings of Power*.

Turning first to similarities between characters in Plaintiff's book and *Rings of Power*, Plaintiff does not identify any of his newly-created characters that supposedly appear in *Rings of Power*. Plaintiff also seems to suggest in his list of so-called similarities that the presence of a Black character is a protectable element attributable to himself. Without remarking on the problematic nature of this contention, suffice it to say that the Court disagrees. See (ethnicity of characters in works that both featured an Irish character in love with a Jewish character not a protectable element).

As for the plot, the two works are different. Plaintiff's work is an intended sequel to *The Lord of the Rings* that involves evil elves and the search for additional rings of power. Rings of Power, on the other hand, is a prequel where, it appears, the magical rings have not yet been created. The fact that both generally involve a fight against an epic evil power is simply generic to the fantasy genre.

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

Nor are the settings at all similar. As the Tolkien Defendants point out, Rings of Power is mostly set in Valinor, Numenor, Lindon, Khazad-Dum, Rhovanion and the Southlands of Middle-earth, while Plaintiff's work is primarily set in Hobbiton, the Old Forest, Bree, Weathertop, Rivendell, Rohan, Orthanc and Minas Tirith.

The remaining "similarities" offered by Plaintiff in Exhibit B to his First Amended Complaint are equally unavailing. The Court agrees with the Defendants that they are either not similar at all or arise in totally different contexts in the works, reference ideas originally attributable to the Tolkien canon, or are too generic to be protectable.

Therefore, even if Plaintiff's work were not an unauthorized derivative, he has failed to plausibly plead that *Rings of Power* infringes his work directly. The Court therefore need not address Plaintiff's confusing theories of contributory and vicarious copyright infringement.

### C.  Plaintiff's Unfair Competition Claim Against the Tolkien Defendants

Plaintiff has also failed to state a claim for unfair competition against the Tolkien Defendants. Plaintiff seems to be asserting that, by sending a Digital Millennium Copyright Act takedown notice to online booksellers, the Tolkien Defendants have engaged in unfair competition. The Court agrees that this state law unfair competition claim is likely preempted by the DMCA. *See Stardock Sys., Inc. v. Reiche*, No. C 17-07025 SBA, 2019 WL 8333514, at *4 (N.D. Cal. May 14, 2019) (intentional interference state law claim preempted by the DMCA) ("Courts in this district have found that the DMCA preempts state law claims arising out of the submission of infringement notices"). To the extent that Plaintiff premises his unfair competition claim on supposed copyright infringement by the Amazon show, his claim fails for the reasons explained above.

Whatever his theory of unfair competition, Plaintiff, in any event, has not addressed his unfair competition claim in his opposition to the Tolkien Defendants' motion to dismiss. *See* ECF No. 45. He has therefore waived opposition to its dismissal. Accordingly, Plaintiff's claim for unfair competition is dismissed.

### V.      CONCLUSION

For the foregoing reasons, the Court GRANTS the Defendants' motions to dismiss.

| | : |
|---|---|
| Initials of Preparer | PMC |

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | 2:23-cv-02831-SVW-E | Date | August 14, 2023 |
|---|---|---|---|
| Title | *Demetrious Polychron v. Jeff Bezos et al* | | |

**IT IS SO ORDERED.**

|  | : |  |
|---|---|---|
| Initials of Preparer | PMC | |